IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>U.S. FOREST SERVICE,<br><br>　　　　Defendant. | Case No. 1:18-CV-044-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it cross-motions for summary judgment. The Court heard oral argument on June 4, 2019, and took the motions under advisement. For the reasons explained below, the Court will grant summary judgment on Count One and require the Forest Service to engage in formal consultation pursuant to § 7 of the Endangered Species Act. The Court will deny defendant's cross motion for summary judgment.

## FACTS

Plaintiff Idaho Conservation League (ICL) claims that the Forest Service is violating the Endangered Species Act (ESA) by failing to consult with other agencies to protect listed fish species that are being harmed by irrigation ditches that divert water – and these fish – from the Salmon River in Idaho's Sawtooth National Recreation Area. The Forest Service responds that agency inaction does not trigger the ESA's consultation requirement under existing Ninth Circuit law.

**Memorandum Decision and Order – page 1**

The Sawtooth National Recreation Area ("SNRA"), located in central Idaho, is administered by the Sawtooth National Forest. The SNRA encompasses the headwaters of the Salmon River and some tributaries of the Salmon River. Several fish species listed as endangered or threatened under the ESA are located in this region, including (1) the Snake River sockeye salmon, (2) the Snake River spring/summer chinook salmon, (3) the Snake River Basin steelhead trout, and (4) the Columbia River bull trout.

Ranchers and farmers have built irrigation ditches that divert water from the Salmon River and its tributaries. These ditches entrain water and fish, often resulting in injury or death to the fish. Following a 1994 study of these diversions in the Sawtooth NRA, Forest Service Hydrologist and Anadromous Fish program Coordinator Mark Moulton wrote a memo – dated January 5, 1995 – discussing the diversions' effects on listed fish. Moulton estimated that there were 118 active diversions in the SNRA on public lands in the Salmon River drainage. *See* AR000256. He identified the multiple ways diversions harm listed fish and habitat, and concluded that diversions were "by far, the most significant effect on designated critical habitat within the [S]NRA." *See* AR000256. Moulton warned that without addressing diversions "we must anticipate continued decline in our aquatic species and their habitats," describing the effects as "catastrophic." *See* AR000258.

About eight months after Moulton's memo, SNRA Area Ranger Paul Ries wrote a letter to the ranchers and farmers diverting water in the SNRA, notifying them that they did not have Forest Service approval and needed to apply for a Ditch Bill Easement (DBE) or other authorization such as a Special Use Permit (SUP). *See* AR000288. By

**Memorandum Decision and Order – page 2**

February 1997, the Forest Service received approximately 50 applications for DBEs and/or SUPs for 36 discrete ditches in the SNRA. *See* AR000415.

The Forest Service noted that 17 of these diversions adversely affect ESA-listed species by limiting downstream flows and found that imposing bypass flow restrictions in the diversions' operation and maintenance plans would be necessary. *See* AR000416. The Forest Service then devised an application processing strategy. *See* AR000432–33. The Forest Service determined it could process at least half of the applications in 1997 and 1998, most of the remaining applications in 1999, and the "most complex cases" by 2000. *Id.*

In developing this processing strategy, Forest Service officials contemplated the potential for Section 7 consultation. In 1997, the Forest Service's Director of Lands sent guidelines to Western Regional Forest Supervisors, including the Sawtooth Supervisor, to provide guidance for processing DBE applications requiring ESA consultation. *See* AR000460. In April 1997, Ries wrote letters to applicants for diversions acknowledging receipt of their applications and informing them the Forest Service was processing their applications. *See, e.g.,* AR003238 (S39).

Rather than evaluate each DBE/SUP application separately, the Forest Service was evaluating environmental impacts for all diversions together to "rectify this longstanding problem." *See* AR000744. With regard to Section 7 consultations, SNRA officials and their superiors at Region 4 of the Forest Service agreed that ESA consultations needed to occur and that the effects of diversions were cumulative and interrelated. *See* AR000748–51.

**Memorandum Decision and Order – page 3**

In 2000, the Forest Service had still not reached decisions on the pending DBE applications, prompting environmental groups to serve the Forest Service with an ESA Notice of Intent to Sue for failing to engage in Section 7 consultation. *See* AR000871. Forest Supervisor Levere responded by committing to initiate ESA consultation for all diversions in the Sawtooth Valley. *Id*. He further promised the Sawtooth National Forest would update its Aquatics Biological Assessment (BA) on the SNRA before the next irrigation season. *Id.* Finally, he committed that "[u]pon completion by the Forest Service, this updated BA will be submitted to NOAA Fisheries Service and Fish and Wildlife Service for consultation." *Id.* He would follow through on these three promises.

In the 2001 Sawtooth Valley All Aquatics BA, the Forest Service determined that every diversion at issue here "may affect" at least one listed fish species or its critical habitat. The Forest Service sent this BA to NMFS and FWS on May 31, 2001, requesting initiation of ESA consultation. *See* AR000930–31 (Forest Service letter to NMFS); *Hurlbutt Decl., Ex. 4* (letter to FWS). For each of the diversions at issue here, the BA stated that the proposed action was to issue "interim" SUPs, "not to exceed 5 years," until such time as sufficient information was available to "issue" permanent easements. *See, e.g. Hurlbutt Decl., Ex 5* (BA), pp. 83.

NMFS found the BA insufficient and listed additional information about each diversion, the associated water right, and potential impacts the Forest Service needed to provide. *See* AR000943–44. It is unclear whether FWS ever responded, but Forest Service briefing notes from June 26, 2001 indicate that the Forest Service planned to

respond to keep the consultation request moving forward with both NMFS and FWS. *See* AR000953.

However, nearly two years later, efforts to consult had "ground to a halt" according to Acting Regional Forester Jack Troyer because of "unresolved disputes between the Forest Service and the regulatory agencies," suggesting NMFS and/or FWS were demanding too much information to initiate consultation. *See* AR000971–72. At the same time Troyer recognized that authorization of water diversions "by the Forest Service is clearly a 'federal action' that should trigger formal consultation under Section 7 of the ESA," and that "[i]t is clear that the Forest Service has an ESA obligation to complete at least some level of consultation on a substantial number of water diversion facilities in the near future." *See* AR000970-71.

Nevertheless, approvals remained stalled, and it appears that by 2005, the Forest Service had a strategy to "[w]ait to resubmit to consulting agencies until we get an NOI [Notice of Intent to Sue under the ESA]." *See* AR001081.

The parties agree that there are currently 20 diversions at issue in this lawsuit, and each has a pending DBE application that has not been acted upon by the Forest Service.

## ANALYSIS

### Count One

In Count One, ICL seeks to compel the Forest Service to consult with two designated agencies pursuant to § 7 of the ESA to consider measures to protect listed species of fish from the harm inflicted by the 20 diversions at issue here. Under § 7, an agency is required to consult with either the Fish and Wildlife Service (FWS) or the

**Memorandum Decision and Order – page 5**

NOAA Fisheries Service (NMFS) if an agency "action" may affect a listed species. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

The Forest Service denies that it has taken any "action" that would trigger an obligation to consult under § 7. The Forest Service is essentially arguing that because it has sat on the DBE applications for over two decades without taking any action to resolve them, the agency cannot be compelled to consult over harm to listed species of fish.

This is an odd argument, attempting to turn delay into a legal defense, something akin to spinning straw into gold. This argument certainly cannot be advanced by counsel with pride. In fairness, the argument takes on some legitimacy when viewed in light of the Forest Service's struggle with low budgets and high demands. Regardless, the Court is left to determine whether the ESA allows an agency to get away with such conduct.

The Forest Service argues that it does and cites the holding of *Western Watersheds Project v. Matejko*, 468 F.3d 1099 (9th Cir. 2006) that agency inaction cannot constitute the affirmative action that triggers the § 7 consultation requirement. *See also, Cal. Sportfishing Prot. Alliance v. FERC*, 472 F.3d 593, 595, 598 (9th Cir.2006) (same); *Western Watersheds Project v. Wood*, 2010 WL 1338134 (D. Idaho Mar. 31, 2010) (same). These cases, the Forest Service argues, require this Court to hold that the agency's failure to act on the pending DBE applications cannot be deemed an "action" that triggers the duty to consult under § 7.

This line of authority is distinguishable. None of those cases involved the situation faced here, where the agency has done a Biological Assessment that proposed a specific action – that is, to issue interim SUPs, not to exceed 5 years – and concluded that

**Memorandum Decision and Order – page 6**

the proposed action "may affect" listed species of fish for each of the 20 diversions at issue here. That agency finding takes this case out of the *Matejko* line of authority. The Ninth Circuit has made clear in a long line of cases that "[i]f an agency determines that an action may affect a listed species or habitat, Section 7(a)(2) requires that the agency consult with the FWS or the Service *before* engaging in the action." *NRDC v. Jewell,* 749 F.3d 776, 779 (9th Cir. 2014) (emphasis added); *see e.g., Karuk Tribe v. U.S.,* 681 F.3d 1006, 1020 (9th Cir. 2012) (en banc) (holding that § 7 "imposes on all agencies a duty to consult with either [FWS or NMFS] *before* engaging in any discretionary action that may affect a listed species or critical habitat") (emphasis added).

In other words, if the agency has proposed an action, and determined that its proposed action may affect a listed species, the agency has a mandatory duty to consult under § 7 before engaging in that proposed action. *Matejko* simply does not apply in this situation. Instead, it provides a parallel line of authority that applies in cases where the agency has not proposed an action that it has determined may affect a listed species.

Of course, the Forest Service originally recognized its duty under § 7 and did initiate consultation but then failed to respond to NMFS's requests for additional information and ultimately just let it drop. Under its own regulations, the Forest Service was required to engage in "formal consultation," which means far more than simply to initiate consultation. See 50 C.F.R. § 402.14(a).

As a final criterion for requiring consultation, the courts have held that the agency must retain some discretion, and that discretion "must have the capacity to inure to the benefit of a protected species." *Karuk Tribe,* 681 F.3d at 1024. If an agency cannot

**Memorandum Decision and Order – page 7**

influence a private activity to benefit a listed species, there is no duty to consult because consultation would be a meaningless exercise. *Id.* "The relevant question is whether the agency could influence a private activity to benefit a listed species, not whether it must do so." *Id.* In *Karuk,* the Circuit held that "the Forest Service exercised discretion when it applied different criteria [to the mining proposals] for the protection of fisheries habitat in different districts of the [National Forest]." *Id.* at 1026.

This case is similar to *Karuk*. Here, the Forest Service has retained discretion under FLPMA to place conditions on a DBE or SUP for the benefit of the listed species. *See* 43 U.S.C. § 1765(a). Thus, this final criteria for requiring § 7 consultation is satisfied here.

For all of these reasons, the Court will grant ICL's motion on Count One, and require the Forest Service to engage in formal consultation with the appropriate agency under § 7 of the ESA.

**Count Three**

In Count Three, ICL seeks to compel the Forest Service to comply with its § 7 consultation duty on the ground that the agency has committed an unreasonable delay under § 706(1) of the Administrative Procedures Act. However, because the Court has already granted that relief above, this portion of ICL's motion is moot.

**Forest Service's Motion for Summary Judgment**

The Forest Service's motion states that it seeks summary judgment on all Counts of the complaint. But the arguments in its briefing focus entirely on Counts One and Three. Thus, it appears to be a motion for partial summary judgment and the Court will

**Memorandum Decision and Order – page 8**

construe it in that manner. Given the Court's rulings on Counts One and Three above with regard to ICL's motion, the Court will deny the Forest Service's motion.

## Conclusion

The relief sought by ICL in Counts One and Three was to compel the Forest Service to engage in formal consultation with the appropriate agency under § 7 of the ESA. Because the Court has granted that relief under Count One, the Court will grant ICL's motion as to Count One and direct the Forest Service to engage in that formal consultation. That decision renders moot ICL's motion as it applies to Count Three because the relief sought under that Count was identical to that sought in Count One. Given these rulings, the Court will deny the Forest Service's motion, which the Court will construe as a motion for partial summary judgment on Counts One and Three.

**ORDER**

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that plaintiff's motion (docket no. 26) is GRANTED IN PART AND DEEMED MOOT IN PART. It is granted to the extent it sought summary judgment on Count One and is deemed moot to the extent it sought summary judgment on Count Three.

IT IS FURTHER ORDERED, that the defendant Forest Service shall engage in formal consultation with the appropriate agency under § 7 of the Endangered Species Act.

IT IS FURTHER ORDERED, that the defendant's motion (docket no. 34) is DENIED.



DATED: June 17, 2019

_____
B. Lynn Winmill
U.S. District Court Judge

**Memorandum Decision and Order – page 10**